Submitted on briefs March 9; modified May 28; rehearing
denied November 19, 1929

# CHARLES COSTON, ADMINISTRATOR, *v.* PORTLAND TRUST COMPANY ET AL.

(278 Pac. 586; 282 Pac. 442)

72

For appellants there was a brief over the name of *Mr. Jerry E. Bronaugh.*

For respondent there was a brief over the name of *Mr. Oren R. Richards.*

For Portland Trust Company there was a brief over the name of *Messrs. Crum, Murdock & Dusenbery.*

For intervenors there was a brief over the name of *Mr. McDannel Brown.*

*Mr. Tom Garland in propria persona.*

COSHOW, C. J. It is established by the record that decedent left a large number of bills and the expenses of her last illness and burial. Said bills amount to $1,457.76. Other claims reported but not verified as prescribed by law amount to $3,750, and other claims known to plaintiff because of the public records amount to $4,100. It is claimed by defendants Mary Jane Herron and other alleged beneficiaries of said trust instrument that this indebtedness, except the record indebtedness and the claims reported but not verified, were incurred after the execution of the trust deed and for that reason cannot be collected from the proceeds of the property attempted to be conveyed

thereby. The claims reported but not filed are claims owned by two of the beneficiaries of said alleged trust. The instrument creates what the learned author, Pomeroy, terms an express passive trust: Pomeroy's Equity (4 ed.), §§ 153, 374, 988, 989. A trustee of such a trust holds only the naked legal title. The estate of such a trust is liable for the debts of the trustor: 3d Pomeroy, (4 ed.), 2153, § 989, note 4. The trustor was the sole beneficiary of the trust during her life.

"Where one creates a trust, retaining the beneficial interest in himself, he cannot prevent his creditors from coming at the income by a provision against anticipation. Nor will a conveyance on secret trust for the grantor be good against creditors, prior or subsequent": 2d Perry on Trusts and Trustees, (6 ed.) 1335, § 815a, notes 3 and 4.

It must be borne in mind in this connection that the instrument creating the trust was never recorded; that the trustor held every indicia of ownership. There was no change of possession or management of the estate. Such a deed, whether absolute or in trust, is constructively fraudulent as to subsequent, as well as existing, creditors: §§ 9874, 10171, 10172, O. L.

Cases holding that actual intent to defraud must be proven in order to set aside or annul a voluntary conveyance, whether absolute or in trust, are cases where the conveyance is promptly recorded: *Seed v. Jennings,* 47 Or. 464 (83 P. 872); *People's Bank v. Rostad,* 86 Or. 695 (169 P. 347). Under these authorities we are of the opinion that the allegation in the complaint that said trust deed was fraudulent as to creditors is proven by the record. A different question would be presented if the trust deed had been placed of record promptly. The instrument itself prescribes that it shall not be put on record. The record

contains a stipulation of the parties that said trust deed was not placed on record. It would be very unequitable to hold under those conditions that creditors of decedent could not collect their claims from her estate.

Both parties rely on *Allen v. Hendrick*, 104 Or. 202 (206 P. 733). The opinion in that case was written by Mr. Justice HARRIS and is characterized by his usual thoroughness. The trust was upheld because the trust property was delivered to the trustee and a present interest therein passed to the beneficiary. Both of those elements of interest are absent in the instant case.

■ The case of *Kelley v. Snow*, 185 Mass. 288 (70 N. E. 89), is also relied on by appellants. In this case the trust property was delivered. That case also involved personalty only. The case at bar involves realty only, the trust instrument was never recorded, possession of the land was never taken by the trustee. The difference in the two cases is material. In the instant case the trust instrument was valid between the trustor and trustee. It is invalid as to creditors. Withholding the trust instrument from recordation constituted a constructive fraud: 26 C. J. 1061, (§ 4) 3. Plaintiff's testatrix apparently recognized her lack of authority to execute deeds for her own benefit under the powers of attorney executed by her husband to enable her to sell and convey the property in order to liquidate their debts. Her husband, defendant Tom Garland, therefore later executed and delivered quitclaim deeds in favor of the trustee.

■■ The learned circuit court held that the trust instrument passed no interest in the property to the beneficiaries other than trustor during the latter's life. We concur in this opinion. The quotation from

the trust deed, included in the statement herein, clearly discloses that the trustor was to receive all the benefits of the trust estate during her life, and that she was to have the sole and exclusive management during the same period. The trustee was not authorized to exercise any power over the estate, except in case the trustor became incapacitated and under that condition the estate was to be managed for her sole and exclusive benefit; consequently there was no interest in the trustor's estate passed or vested in the other beneficiaries. The trust instrument amounted solely to a testamentary disposition of her property. Several years later she executed a will making the beneficiaries of the trust instrument the beneficiaries of her will. The beneficiaries of a will take the property subject to the debts of the testator.

■ The learned circuit court annulled and set aside the trust instrument in its entirety. That instrument was executed in behalf of defendant Tom Garland by decedent as his attorney in fact. But later defendant Tom Garland executed several quitclaim deeds. His testimony is to the effect that these deeds were executed for the purpose of protecting some of the beneficiaries of the trust instrument; that the decedent and defendant Tom Garland were indebted to some of those beneficiaries and desired to protect them. The decree appealed from gives to defendant Tom Garland the benefit of his curtesy interest in the land described in the trust deed. In this we think the court below erred. It was a worthy act on the part of defendant to join his wife in protecting their creditors against loss. The execution of the deeds by defendant Tom Garland was voluntary, but his interest therein, so far as this case is concerned, was a prospective curtesy. Whether or not that curtesy would ever become con-

summate was uncertain. We think that defendant Tom Garland by those deeds waived his curtesy interest in the land described therein.

The decree of the court below is affirmed in so far as it holds the trust instrument void as to creditors subsequent to as well as existing at the time said instrument was executed. It is modified in so far as it annuls the effect of the quitclaim deeds executed by defendant Tom Garland. A decree will be entered here accordingly. No party will recover costs or disbursements in this court. MODIFIED.

BROWN, J., did not participate in this opinion.

———————

Rehearing denied November 19, 1929

ON PETITION FOR REHEARING.
(282 Pac. 442)

*Mr. Oren Richards* for plaintiff-respondent.

*Messrs. Murdoch, Crum & Dusenbery* for Portland Trust Co.

*Mr. Tom Garland in propria persona.*

*Mr. Jerry E. Bronaugh* for appellants.

*Messrs. Ridgway, Johnson & Kendall* for Trust Companies of Oregon.

*Mr. McDannell Brown* for intervenors-respondent.

The appealing defendants have petitioned for a rehearing. An argument in favor of a rehearing has been presented by Trust Companies Association of Oregon as *Amicus Curiae.* It must be remembered that defendant Portland Trust Co. did not appeal and will be considered satisfied with the decree of the circuit court: *Coast Engine & Machine Works v. Bar-*

*bee et al.,* decided July 16, 1929, — Or. — (279 P. 264); *Davis v. Davis,* 123 Or. 667 (263 P. 914); *Adams v. Kennard,* 122 Or. 64, 96 (222 P. 1092); *Ontario Advancement Co. v. Stevens,* 113 Or. 564 (231 P. 127); *Johnson v. Prineville,* 100 Or. 105, 118-9 (196 P. 817); *Crumbley v. Crumbley,* 94 Or. 617 (186 P. 423); *Caro v. Wollenberg,* 83 Or. 311 (163 P. 94).

"It is the duty of every judicial tribunal to determine rights of persons or property which are actually involved in the particular case before it. As the supreme court had occasion to say in *California v. San Pablo & Tulare Railroad,* 149 U. S. 308, 314 (13 Sup. Ct. 876, 878, 37 L. Ed. 747):

" 'The court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it. No stipulation of parties, or counsel, whether in the case before the court, or in any other case, can enlarge the power, or affect the duty, of the court in this regard' ": *Panama R. Co. v. Johnson,* 289 Fed. 964, 972.

We can not, therefore, consider the interests of any defendants excepting Mary Jane Herron, Ruth E. Peck, Vaughn Anstine and John Anstine who appealed.

In their behalf it is earnestly contended that the trust was valid and should have been sustained. The brief of learned counsel as amicus curiae is quite lengthy and manifests much industry examining and searching authorities. Much is written therein besides the points decided.

Stress is placed on the language and terms used in our opinion. Nothwithstanding the word "deed" is used in its broad sense as clearly appears from the context rather than in its restricted meaning as a con-

veyance of real property, much labor and time is expended in order to prove that the writer of the former opinion was wrong in his conclusions as well as unfortunate in his choice of words. The former opinion mentions several times that the trust deed was not recorded. The context clearly shows reference is thereby made to the agreement expressing or declaring the trust. A deed is defined as "a written instrument under seal, containing a contract or agreement which has been delivered by the party to be bound and accepted by the obligee or covenantee." Bouvier's Dictionary. The trust agreement in the instant case answers the description perfectly.

The deed conveying the land from the trustor to the trustee was an ordinary conveyance without any conditions, qualifications or trust provisions. We learn that it was intended as a trust from extraneous evidence entirely. The reservations in the arrangements between the contracting parties in favor of the trustor were secret. The word "trust" or "trustee" does not appear in the conveyance. In the expression "that the trustor held every indicia of ownership" too much is expressed. But in this connection it must be admited that the conveyance to the trustee was impliedly excepted. The opinion states that the trustee held only the naked legal title. Every indicia of ownership was secretly retained by the grantor excepting the bare legal title. The record also discloses that not only did the trustor reserve secretly the right to revoke the trust, and to dispose of the property, but also that she did actually dispose of the property, after executing the deed and trust agreement, by her last will and testament which has been duly probated. Plaintiff is the duly appointed administrator of said trustor's estate with said will annexed.

Petitioners for rehearing seem to overlook the expression in the former opinion that the arrangement between the trustor and trustee is valid as between them, but invalid as to creditors.

As the case stands here it is a contest between Coston as administrator and Mary Jane Herron and the other beneficiaries of the alleged trust. In other words, shall the beneficiaries of the trust agreement be preferred to the creditors of the trustor? We think the decedent trustor intended that her creditors would be paid out of her property, otherwise she would not have executed her last will and testament as and when she did. If the position taken by appellants with regard to the trust agreement and deed be sound, would the decedent trustor have executed her last will and testament as and when she did? The beneficiaries of her alleged trust and the devisees and legatees of her will are identical. If they receive under the deed, shown to have been given in trust by the trust agreement, her creditors will remain unpaid. If those same parties receive under the will, as the writer believes beyond doubt the decedent Netta A. Garland intended, her creditors will be paid and her beneficiaries receive all that they are entitled to. The court should not be an instrument of injustice by preventing creditors from collecting from an estate the just obligations owing them by the decedent. Particularly is this true when the conduct of the decedent, as shown by her last will and testament, indicates that she intended her creditors to be paid. To hold otherwise is to do dishonor to the name of the decedent. The decedent was an attorney and would not have executed her will if her arrangement with defendant trust company had been sufficient to pass the property absolutely to that company for the benefit and use of the appealing defendants.

Oregon Laws, section 10169, voids all deeds of gift and conveyances, as well as all transfers or assignments, verbal or written, of goods and chattels, or things in action, made in trust for the person making the same as against the creditors, existing or subsequent, of such person. It is argued, however, that said section 10169 relates to personal property only. No reason has been assigned, or can be, why a secret trust in favor of the grantor of real property should not be void as to creditors as well as a secret trust in favor of the transferor of personal property. It is contended that in as much as the compilers for a long time have entitled this section ''Transfers of Personal Property, When Void'', therefore said section refers only to personal property, but both of the expressions ''deeds of gift'' and ''conveyances'' are applicable to the transfer of the title to real property and are not properly used in designating the transfer of personal property. The statute is question is an old one. It was passed January 16, 1854. It was section 11, title II, in the chapter entitled ''An Act Relating to Fraudulent Conveyances,'' in the statutes of Oregon of 1855. Title I of said chapter is devoted to fraudulent conveyances dealing exclusively with land and the rents and profits of lands and charges upon land, or the rents and profits thereof. Title II deals with both land and goods and chattels. Section 11 is intended to cover every form of property, both real and personal. Title III of the chapter covers general provisions relating to titles I and II of said chapter. Section 32 of title III of said chapter reads as follows:

''The term 'conveyance,' as used in this chapter, shall be construed to embrace every instrument in writing, except a last will and testament, whatever may be its form, and by whatever name it may be known in

law, by which any estate or interest in lands is created, aliened, assigned or surrendered.''

In the same statute as compiled by Deady and Lane entitled General Laws of Oregon from 1843 to 1872, the corresponding section to said section of General Laws of 1855 reads as follows:

''The term 'conveyance,' as used in titles II, III and IV of this chapter, shall be construed to embrace every instrument in writing, except a last will and testament, whatever may be its form, and by whatever name it may be known in law, by which any estate or interest in lands is created, aliened, assigned or surrendered'': § 57, title IV, ch. 6, Misc. Laws, Gen. L. of Oregon, 1843-1872.

The word ''conveyance'' appears only once in said title III, and that is in section 45 thereof. Said section 10169 is identical with section 45 of said title III by Deady and Lane. The section defining the word ''conveyance'' as used in O. L. is § 10176 thereof. There has been no material change in the language of these sections since the enactment of the statute in 1854. Why the legislature should have specifically referred to the title relating to personal property when defining the word ''conveyance,'' unless it intended that the word ''conveyance'' as therein used related to real property, has not been explained, nor can be. That said title is devoted mainly to personal property is not questioned. There is no doubt about the statute referring to personal property. That is not a controverted question. But that it was intended to refer to real property also is conclusively shown by defining conveyance as therein used as embracing ''every instrument in writing, * * * by which any estate or interest in lands is created, aliened, assigned or surrendered.'' We must give the legislative assembly

credit for correctly expressing its intention. That credit is especially due to these sections because they have stood the test of time, no change having been made therein since they were enacted in 1854.

The language "deed of gift" also indicates that the section embraces real property in addition to personal property mentioned therein. Appropriate words are used in treating of personal property. This court in the only case in which it has construed said section 10169 interprets it as embracing real property as well as personal property: *Leasure v. Forquer*, 27 Or. 334, 339 (41 P. 665). It is claimed that the construction of said § 10169 in the case last cited is obiter dictum. The gist of the controversy in that case was the alleged fraudulent transfer of real property by Forquer. It was claimed in that case that Bosworth was holding the premises in secret trust for Forquer's use and benefit. The court held that Forquer had no interest in the land, having conveyed all his interest therein to Bosworth prior to contracting the indebtedness involved in the case. The claim by one party that Forquer had secretly retained an interest in the land he had conveyed, and the denial of that claim by the other party, was an issue in the case; consequently the construction of said § 10169 was directly before the court. The court clearly indicated that if the title to said land was vested in Bosworth in trust for Forquer the conveyance was void. The wrong intended to be prevented by said § 10169, O. L., is the *secret* retention of an interest in the property conveyed or trasferred. The wrong done by such secret transaction is as injurious when involving realty as when involving personalty.

Cases of the nature of the instant case must be decided upon the peculiar facts of each individual case.

Courts will scrutinize with great care every set of facts which operates to prevent creditors from collecting debts from property owned by their debtors when such property is required to pay just indebtedness. All the instant case determines is that the facts disclosed by this record entitle plaintiff to administer the property in dispute as the property of trustor's estate. It was so used during trustor's life time. It was devised by will by the trustor after she had pretended to convey it to the trustee.

By executing her will after conveying the property to the trustee she exercised a power inconsistent with the disposition she attempted to make by the trust arrangement. The manner of conducting the trust property indicates she intended to provide for the distribution of her property after her death. If she intended to vest title in her beneficiaries at the time she executed the trust arrangement she would not thereafter make disposition thereof by will. There would have been no property to devise. Such conduct on the trustor's part is convincing that more than possession was deferred. It shows that decedent's interest in the property did not pass to the beneficiaries, and was not intended to pass until after the death of the trustor. The trust agreement was, therefore, testamentary in nature. If petitioners' position were tenable there would have been no property on which the will could operate.

Neither the benefit, control or possession of the property was delivered to the grantee in the conveyance. Headnote 1 in *Haulman v. Haulman,* 164 Iowa, 471 (145 N. W. 930), states the rule in such cases thus:

"The legal title to any property may be conveyed to a trustee to be held for the benefit of others: 'but where enjoyment is deferred until after the death of the

grantor the legal title remains in him until his death and the instrument is to be treated as testamentary in character. Where, however, the conveyance transfers the *title, dominion* and *control* of the property to the trustee at the time of its execution, a postponement of the enjoyment to some future time will not make the instrument testamentary in character.' ''

It would be unwise for the court to do more in the instant case than to decide it. We decline, therefore, to enter into a discussion of the mooted questions very ably presented in the several arguments advanced in support of the petition for rehearing.

The petition for rehearing is denied.

REHEARING DENIED.

RAND, J., concurs in the result.

BROWN, J., did not participate.

ROSSMAN, J., dissenting. This entire matter is before us again upon a petition for a rehearing presented by the appellants. Accompanying this petition and appellant's brief is another brief, very thorough in nature, filed by counsel for the Trust Companies' Association of Oregon.

It may be well at the outset to state the facts out of which this piece of litigation arose. In May of 1924, Thomas L. Garland and Netta A. Garland were husband and wife. At that time the title to at least four pieces of real property in the city of Portland was vested in the name of the wife. The record does not reveal the value of three of these properties, nor indicate definitely whether Mr. or Mrs. Garland at that time owned any other property, real or personal. However, Mr. Garland testified that the piece of property known as the Garland hotel, which is not one of the three properties later conveyed to the trust com-

pany, could be sold at that time for $40,000; it was subject to a mortgage indebtedness of $19,500; about six months prior to Mrs. Garland's death it was sold for $37,000. The evidence also indicates that at approximately this time Mrs. Garland acquired 10 acres of land near Oregon City; its value is not shown by the evidence. In answer to an inquiry whether he and his wife owed any debts in May of 1924, Mr. Garland replied: "I couldn't say exactly, but we always owed money because we had various pieces of property and there were repairs and taxes, etc., always on this property." Later he expressed a belief that he and his wife owed a sister of the latter "about $3,000," and another sister "about $2,500." Of the three remaining properties, and they are the ones which were conveyed to the trust company, two were apparently encumbered with mortgages, while the third was subject to some liens for unpaid special assessments. The foregoing provides us with the only insight supplied by the record into the financial condition of Mr. and Mrs. Garland in May of 1924. The former testified that the purpose of the deeds and trust agreement, which we shall review later, was to secure to Mrs. Garland's two sisters payment of the sums borrowed from them. There is no evidence contrary to any of the above; in fact, the transcript of evidence is unusually brief. The foregoing, together with some testimony concerning the debts of Mrs. Garland at the time of her death, which we shall later review, constitutes all of the evidence offered.

The very meager information, which we have concerning the property and financial condition of the Garlands in May of 1924, would seem to warrant the conclusion that their condition was above the average. There is no testimony that any creditor was pursuing

them, nor evidence of any financial difficulty; there is no evidence whatever of any actions at law threatened or begun by a creditor, and certainly no evidence of insolvency; in fact, it seems that in May of 1924 these two people owed only current debts arising out of their ownership of real property, except two sums due to Mrs. Garland's sisters.

May 23, 1924, Mr. and Mrs. Garland executed three warranty deeds whereby they conveyed to Portland Trust company the above three parcels of real property, owned by Mrs. Garland. These deeds were recorded in the deed records of Multnomah county May 31, 1924. May 28, 1924, Netta A. Garland entered into a trust agreement with the Portland Trust company whereby she appointed the latter trustee of these properties. The principal features of this agreement may be thus stated. The trustee was required to deal with the properties only when so authorized in writing by the trustor; it released any purchaser of the property from any requirement to see to the proper application of the purchase money paid therefor, or to inquire into the necessity of any act of the trustee; it contained a provision for the reimbursement of the trustee for expenses and liabilities incurred; it provided that the trust agreement should not be placed of record; that Mrs. Garland should have the control of the properties during her lifetime, but that in the event of her incapacitation "the trustee shall have full control over same, with full power to sell, exchange, or otherwise dispose of any part of said property as in its absolute and uncontrolled discretion it may deem best or necessary, and to pay all sums coming into its possession, arising both from sale of the property or from rents or income accruing therefrom, after deducting all charges, at such times and in such manner as to

it seems best, for the care, support and comfort of said trustor Netta A. Garland.'' The agreement reserved to Mrs. Garland a power of revocation and contained a provision permitting subsequent conveyances to the trustee of additional properties; it stipulated that upon the death of Mrs. Garland the trustee should continue to hold title to one of the properties generally referred to as the Albina property with power to sell, exchange or otherwise deal with it and pay all of its income to Mary Jane Herron, one of the appellants; upon the latter's death the trust property was to be divided equally between Vaughn and John Anstine and Ruth E. Peck, being the other three appellants; the remaining trust property it was agreed should be distributed equally between the three latter individuals.

The trust agreement was not recorded, although as we have previously observed the deeds to the trustee were promptly recorded.

February 17, 1926, Mrs. Garland executed her last will and testament; this document mentioned the three above properties and devised them in precisely the same manner as was directed in the trust agreement. May 15, 1927, she died testate and thereafter letters of administration, with will annexed, were issued to Charles Coston, a respondent herein, who as plaintiff instituted this suit. His complaint alleges the ownership by Mrs. Garland at the time of her death of the above described three pieces of property, her conveyances to the trust company, and alleges that the latter became her agent holding the title for her use and benefit. Continuing, the complaint avers that the Garlands conveyed this property ''knowing at the time they were heavily indebted, with intent to delay, hinder and defraud their creditors,'' and that the conveyances were ''void as against the creditors.'' The

complaint alleges that Mrs. Garland at no time relinquished control of the property nor parted with the equitable title thereto, and that the estate possessed no funds with which to satisfy the expenses of administration and the claims against it. It prayed that the deeds to the trust company be declared null and void, that the realty be declared the property of the estate, and that the trust company be required to reconvey it. A bill of particulars filed by the administrator, showing the claims against the estate, filed or reported, shows an indebtedness of $9,307.76; the total claims filed aggregate $1,457.75. It indicates that only two debts were incurred prior to May 29, 1924; these two are the following: $137.28 to Meier & Frank Co. and $150 to Mr. James B. Finnigan. The difference between the $1,457.75 aforementioned and the aggregate sum of $9,307.76 is comprised of $3,750 due the two sisters previously mentioned, and $4,100 secured by mortgages covering real estate included in the trust. The claim filed by the Meier & Frank company does not indicate when the indebtedness arose; it is as follows: "1927 April 25, to balance as per bill rendered $137.28." The claim filed by Mr. Finnigan for $150 arose out of professional services as an attorney performed by him "between the first day of January, 1924, and the first day of April, 1927 * * * in the examination of abstracts of title to real property, preparation of deeds, * * *." The decree of the lower court held the trust agreement void.

The plaintiff argues that the conveyances and trust agreement were made for the purpose of hindering, delaying and defrauding Mrs. Garland's creditors. We have previously set forth verbatim the only portions of the complaint which were intended to raise this issue. We are very doubtful whether these pure conclusions

are adequate to serve the plaintiff's purposes, but since we have the facts before us we shall dispose of them and deem the complaint sufficient. It seems clear that the evidence warrants no finding that the conveyances were made for the purpose of defrauding anyone nor of hindering or delaying any creditor. The conveyances and the execution of the trust instrument are not embarrassed with any badges of fraud. As is provided in § 10170, O. L., "the intent to hinder, delay or defraud creditors or other persons of their lawful * * * demands" is an essential element in an attack of this character. When Mrs. Garland made these conveyances she did not part with all her properties; she retained the Garland hotel property which was worth $20,000 in excess of the mortgage of $19,500 which encumbered it. She also acquired at approximately that time 10 acres of land in another county. The meager record before us does not reveal whether she possessed any other assets at that time; but it indicates clearly that apart from two sums owing her two sisters all her other debts, if any, were current ones. In fact, the surplus value in the Garland hotel property over the mortgage indebtedness was apparently much greater than all her debts. Certainly one in her financial condition could create a trust of this character in which her two major creditors became the principal beneficiaries without being accused of endeavoring to defraud her creditors. The evidence demands the conclusion that no fraudulent or improper purposes attended the execution of these conveyances; quite to the contrary it establishes a purpose upon the part of Mrs. Garland to secure the only two creditors she had except those whose accounts were current ones. We, therefore, conclude that these conveyances were not violative of § 10170, O. L.

The provisions of § 10169, O. L., cannot assist plaintiff's suit. That section, in our opinion, concerns itself exclusively with conveyances of personal property, while the subject-matter of this suit is real property. § 10169, O. L., provides:

"All deeds of gift, all conveyances and all transfers or assignments, verbal or written, of goods and chattels, or things in action, made in trust for the person making the same, shall be void as against the creditors, existing or subsequent, of such person."

The section just quoted is a portion of subchapter b of chapter XII of title LII of our code. Chapter XII, which is entitled "Of Fraudulent Conveyances," contains three subchapters. The first of these, which is designated with the letter "a," is entitled "Fraudulent Conveyances of Real Property"; the second, which is subchapter "b" bears the caption "Fraudulent Gifts and Transfers of Personal Property," and the third, or "c," is entitled "Fraudulent Conveyances and Assignments Generally." § 10169 bears the heading "Transfers of Personal Property When Void." Since this section of our laws defines, as the subject-matter of its regulation, "Goods and Chattels, or Things in Action," it would seem clear that it could have no reference to a conveyance of real property. However, in *Leasure v. Forquer*, 27 Or. 334 (41 P. 665), this court intimated that this section applied to a conveyance of real property; even a cursory examination of that decision readily discloses that the statement just referred to was obiter dictum. The fact that § 10176 defines the word "conveyance" as including "every instrument—by which any estate or interest in lands is * * * alienated * * *" is said to indicate a legislative purpose to broaden the scope of § 10169 to make it applicable to conveyances of realty. But, when we

bear in mind that ch. XII, which contains three sub-chapters, one of which is concerned with conveyances of real property only, and another of which is concerned with like transfers of both real and personal property, it is not difficult to understand that the term "conveyances should be thus construed only when the instrument conveys land"; this conclusion seems to be especially warranted by the fact that subchapter "b" clearly affects transfers of personal property only. Certainly the legislature did not intend in such an awkward manner to make the words "goods and chattels, or things in action," employed in § 10169, include real property. The history of § 10169 readily dispels any doubt created by the two sources just referred to. It came into our laws as a section of Statutes of Oregon 1853. It there appears upon page 483, being § 11 of title II of chapter I. The latter is entitled "An Act Relating to Fraudulent Conveyances," and § 11 and title II bear substantially the same headings as §10169 and subchapter "b" at the present time. The Code of 1853 was prepared by Messrs. James K. Kelly, Rueben P. Boise and Daniel R. Bigelow, who had been appointed commissioners "to prepare a code of laws"; see IV Oregon Historical Society Quarterly, 185, and I Oregon Law Review, 184. These men felt that their authority "did not simply authorize us to make a revision of the statutes now in force, but that it required us to prepare a full and complete code * * *. It will be perceived upon an examination of our report, that we have adopted some of the statutes now in force; others have been very materially changed, and not a few have been wholly supplied." The above excerpt is quoted from the report of the commissioners, a copy of which may be found in the publications above mentioned. The pro-

visions regulating fraudulent conveyances constituted new legislation, and were not a mere codification of previous enactments; this statement is justified by the following taken from the preface of the Code of 1853: "We have also incorporated that part of the New York statutes which refers to * * * Fraudulent Conveyances and Contracts." An examination of the New York adjudications may, therefore, be helpful. The decision in *Curtis v. Leavitt,* 15 N. Y. 9, supplies much evidence of thoroughness and construes a statutory provision of that state precisely the same as § 10169, except that the word "and" is omitted in the New York statute after the word "conveyance" and after the word "goods," and the latter employs the words "the use of" after the words "in trust." It will be observed that these slight differences between the two enactments are inconsequential. In *Curtis v. Leavitt,* supra, it is pointed out that legislation of this type was enacted in England as early as 1487 and re-enacted in New York in 1787. While the portion of the decision applicable to this statute is principally composed of the court's reasoning whereby it arrived at the conclusion that such legislation is directed against transfers for the personal use of the transferor, and that its effect is to avoid conveyances which are wholly for his use, nevertheless the decision clearly indicates that the court had no idea that this legislation affected real property; for instance, it pointed out: "Its object is to render simply ineffectual, purely nominal transfers of personal estate where the entire use and control are, by a declaration of trust, in or out of the instrument left in him who makes the transfer." The New York courts have confined the application of this statute to transfers of personalty: *Sloan v. Birdsall,* 58 Hun, 317 (11 N. Y. Supp. 814); *Brown v. Guthrie,* 39 Hun,

29; *Knapp v. McGowan,* 96 N. Y. 75; *Gilman v. Mc-Kardle,* 99 N. Y. 451 (2 N. E. 464, 52 Am. Rep. 41). In the early case of *Goodrich v. Downs,* 6 Hill, 438, decided nine years before our adoption of New York's code on fraudulent conveyances, the court of that state pointed out: ''Now here, the legislature have not only declared that every conveyance made with intent to hinder, delay or defraud creditors shall be void; but they have added that every conveyance of goods, etc., in trust for the use of the person making it, shall be void as against creditors.''

As is pointed out in *Curtis v. Leavitt,* supra, legislation of the type before us had its counterpart in the early days of our jurisprudence. From Bigelow on Fraudulent Conveyances, Knowlton's Edition, we quote:

''This subject of trusts, in favor of debtors carries us back more than five hundred years, to a statute of the reign of Edward the Third, given in a preceding chapter, against conveyances of lands by debtors 'to their friends by collusion of having the profits thereof at their pleasure'; which statute, a little more than a hundred years later, was supplemented by another, of the reign of Henry the Seventh, also given heretofore, in which it is declared that 'all deeds of gift of goods and chattels, made or to be made of trust, to the use of that person that made the same deeds, be void and of none effect.' The statute of 13th Elizabeth, which was perhaps a broad codification of the earlier statutes, dropped the specific declaration of these statutes for the general words under consideration.''

The statute of 13th Elizabeth provided conveyances made with intent to ''delay, hinder, or defraud creditors'' shall be ''deemed and taken to be clearly and utterly void, frustrate, and of none effect'': Wait on Fraudulent Conveyances, 3d Ed., § 19.

From a footnote upon page 240, Bigelow on Fraudulent Conveyances, Knowlton's Edition, we quote:

"There may be some doubt whether the statute of 13th Elizabeth was intended to codify and supersede the earlier legislation above mentioned. The revisers of the statutes of New York, following earlier legislation in that state, appear to have thought that the statute of Elizabeth had nothing to do with the older statute; and they accordingly drafted a separate statute to meet the case of trusts in personalty. In the Rev. Sts. of 1829 this special piece of legislation, expanded from an act of February 26, 1787, appears as follows: 'All deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels or things in action made in trust for the use of the person making the same, shall be void as against the creditors existing or subsequent of such person.' "

Burrill on Assignments, 6 ed., p. 430, likewise refers to the New York legislation of which § 10169, O. L., is a counterpart as a "statute against conveyances of personal property in trust for the use of the grantor."

Our examination of the authorities has revealed no adjudication applying a statute similar to § 10169 to a conveyance of real property; to the contrary the Idaho court has held that its statute, which is similar to § 10169, "has no application to sales of real property": *Brown v. Perrault*, 5 Idaho 729 (51 P. 752).

From the foregoing the conclusions seem warranted that § 10169 had its inception historically in the statute of Henry the Seventh, which clearly governed only trusts in personalty for the exclusive use of the trustor. Specifically, as was pointed out by the authors of the Code of 1853, § 10169 was copied from the New York statutes which affected only transfers of personal property. The New York code of 1829 contained a section defining the word "conveyance" in language exactly

similar to § 10176, O. L. The above review of the history, phraseology and purpose of § 10169, taken together with the adjudications upon the New York statute, are decisive that its application is confined to trusts in personalty for the exclusive benefit of the trustor. But before closing this matter we notice that the term "deeds of gift" which it is claimed indicates that this section of our laws is applicable to conveyances of real property is frequently applied to voluntary transfers of personalty: *Wyche v. Greene,* 11 Ga. 159, and *McWillie v. Van Vactor,* 35 Miss. 428 (72 Am Dec. 127). And this court has encountered no difficulty in applying the word "conveyance," as found in the statutes of this state, to transfers of personalty: *Ayre v. Hixson,* 53 Or. 19 (98 P. 515, 133 Am. St. Rep. 819, Ann. Cas. 1913E, 659). We conclude, therefore, that § 10169 is not available to the plaintiff because it is not applicable to alienations of realty; by so stating our conclusion we leave no intimation that such legislation, if applicable to alienations of realty, would defeat in toto a trust agreement of this character; nor do we mean to infer that the estate of these appellants would be affected by such a statute after the death of the trustor.

We come now to a consideration of the next attack upon the trust agreement and conveyance, which argues that this disposition of Mrs. Garland's properties was testamentary in character. It is well at this point to observe that the three warranty deeds and trust agreement were fully executed and delivered; the deeds were publicly recorded and vested in the trust company the legal title to the three properties. No further act remained to be done by Mrs. Garland to consummate the trust company's title. The transaction

was not executory but executed. The principal beneficiaries of the trust were individuals to whom Mrs. Garland was indebted. Unless some ancillary policy of the law denied legal significance to the above acts the law of conveyances recognized them as completely executed transfers of title from Mrs. Garland to the trust agreement and regarded it as a fully created trust. Thus, it is seen by these transfers something of Mrs. Garland's estate passed from her into the trustee for the benefit of the cestui que trustent, and that by the agreement the parties separated the legal and equitable estates in these three properties. A will becomes effective only upon the death of the testator; until that time it passes no title, creates no rights, and works no change in the estate of its author. It remains entirely ambulatory until death stills the hand of its penman. A trust agreement and conveyance of the type before us operates in praesenti and postpones to the future only the enjoyment by the cestui que trustent of the estate. The problem present, therefore, is whether such a postponement and the reservation to the trustor of a power of revocation defeats the trust.

The argument that the above contemplated disposition of Mrs. Garland's property is testamentary in character is basically founded upon the assumption that possibly she availed herself of this method so that her estate might escape payment of the inheritance tax. The facts before us do not lend any support to this inference. Moreover, if this argument is available, when the estate is of sufficient value to be taxable, it loses its effect when the estate is so small as to be nontaxable. And, likewise, this argument takes no cognizance of the fact that the trustor might have preferred this method of disposing of his property for other reasons entirely satisfactory to himself. In

*Attorney General v. Jones,* 3 Price, 368 (146 Eng. Rep. 291), Baron Wood answered a similar argument thus:

"And probably it was done with that view; but that was no fraud, that I know of. There are two ways of doing it; a man may, by deed in his life-time, dispose of his property, reserving the use of it to himself for life, and after his death direct it to go to his children, or such persons as he may think proper; or he may do the same thing by making a will; but he is not obliged to prefer either mode to the other; he may choose which mode he pleases, the law leaves it to his option. He may say, I will not do it by will, I will do it by deed; I will do it by deed, because I shall only have the stamp to pay for; and not by will, because it will be subject to a large legacy-duty which will attach upon it, and which my legatee will be bound to pay. He has a right to do so; he has a right to make his election. If you can show any law which says, that where there are two ways of doing a thing, the person shall do it in the most beneficial way to the revenue, you will effect something. But there is no law that so fetters any man as to his property; he may dispose of it by deed, confessedly to avoid the legacy-duty, which, if it were done by will, it would be subject to, but that is no fraud. If it is a defect in the law, it must be remedied by the legislature; but we must decide upon the law as it stands. When the tax was laid on hair powder, the people ceased to wear it. Could you say that there was a fraud, and that therefore they must pay the tax whether they will wear powder or not? It would be monstrous; it goes to such an extent that there would be no end to it. It was no fraud in this testator to take the course most beneficial to himself, though less so to the revenue; it was a matter of prudence in him, but it was no fraud."

Since the argument that Mrs. Garland might have thus disposed of her property to avoid payment by her estate of inheritance taxes is obviously without merit, it remains necessary to consider only the question pre-

sented by the facts: (a) the retention by the trustor of the right to manage and control the property during her lifetime, except in the event of her incapacitation, or her written request to the trustee to assume control; (b) the trustor's reservation of a power to revoke the trust; and (c) the postponement to the time of Mrs. Garland's death of the enjoyment by the beneficiaries of the trust estate. The plaintiff argues that these circumstances identify the trust agreement as a testamentary instrument, or constituted the trust company the agent of Mrs. Garland.

Practically all of these arguments are answered adverse to the plaintiff by the decision in *Allen v. Hendrick,* 104 Or. 202 (206 P. 733), but we shall apply ourselves again to a consideration of the matters involved.

It is clear that this transaction did not make the trust company the agent of Mrs. Garland. In *Keck v. McKinstry,* 206 Iowa 1121 (221 N. W. 851), a similar argument was advanced concerning a situation and a trust agreement bearing striking resemblances to those before us. In that case one John McKinstry was the trustor and another Albert McKinstry was the trustee. We quote from the decision as follows:

"Manifestly that estate was in trust. The duties required of Albert McKinstry, whether in law or in equity, were not duties to a principal for, and in the name of, John McKinstry. The acts of Albert McKinstry in the performance of his duties would not be the acts of John McKinstry. They would be his own acts and in his own name as trustee. The arrangement has no semblance either in name or purpose to an agency."

We are at a loss to understand why the reservation of a privilege to revoke a trust should identify the instrument creating it as testamentary of nature. As we have already observed the execution and delivery of

the deeds effectually transferred the title to the properties; that transaction was not in fieri, but was executed. We have also observed that when the parties subscribed to the trust agreement they separated the legal and equitable estates in these properties and entitled the beneficiaries of the trust to a well defined interest in the estates created. The power of revocation, which Mrs. Garland reserved, could terminate the above and recall to herself the title to these properties, but it did not prevent in the first instance the passing of title from herself, the creation of the trust, and the recognition in the beneficiaries of an interest in these properties. From *Allen v. Hendrick,* 104 Or. 202 (206 P. 733), we quote the following written by Mr. Justice HARRIS:

"The power of revocation may be reserved by the creator of the trust, and if not exercised by him during his lifetime the validity of the trust remains unaffected. The reservation of the right of revocation does not affect the legal title of the property, for that passes, and remains vested for the purposes of the trust, notwithstanding the existence of the right to revoke it."

The very fact that it would have been necessary for the parties to cancel the trust agreement, and for the trust company to reconvey the three properties before the reserved power of revocation could accomplish the desired result is convincing proof that the instrument was not testamentary. A revocable trust is effective and subsisting until revoked, whereas a testamentary instrument is ambulatory until the death of its maker. Even the authorities which have construed instruments, which attempted to create trusts, as testamentary of character concede that the reservation of a power of revocation does not identify the instrument

as testamentary: We quote from *Warsco v. Oshkosh Savings & Trust Co.*, 183 Wis. 156 (196 N. W. 829):

"No difficulties arise from the fact that a trust is revocable. That does not affect its validity. *McEvoy v. Boston Five Cents Sav. Bank,* 201 Mass. 50 (87 N. E. 465); 26 Ruling Case Law 1206. Indeed, in an early day trusts not revocable were closely scanned by the courts to see that they were voluntary and understandingly made: 26 R. C. L., 1209."

We conclude that the reservation of a power to revoke the trust did not convert the instrument into one of a testamentary character.

The fact that the trust agreement postponed the enjoyment by the beneficiaries of the trust estate until the death of the trustor is a matter of no consequence. Had the enjoyment of the estate been postponed for a brief definite period of time no one would have argued that the instrument was thus identified as of a testamentary character. We quote from *Allen v. Hendrick,* supra:

"It is competent for the settler to make his death the event upon the happening of which the estate in interest, previously vested in praesenti but to be enjoyed in future is to come into possession. Death is the time when the trust, already perfectly constituted, is, as to the estate previously vested in interest by it in the trusee, for the beneficiary, to come into possession of the beneficiary to be enjoyed. * * *

"The fact that the enjoyment of the estate is postponed to a future date does not negative the idea that a present interest is created in favor of the party or parties for whose benefit the trust is declared. A present interest is transferred, but the enjoyment of that interest is deferred."

In fact, the duties of the trustee were not postponed until the time of Mrs. Garland's death; in the event

of her incapacitation or her written request the trustee was required to act. Nor do we believe that the fact that Mrs. Garland reserved to herself the privilege of remaining in possession and control of the properties demands that the instrument should be construed as testamentary. We again quote from *Allen v. Hendrick*:

"A trust may be created for the benefit of the settlor during his life with remainder to other persons; * * *

"At first blush, it may appear that reservation by the creator of the trust of the right to call upon the principal of the trust funds 'in case I come to need any part or all of them' and the exercise of that right operate as a revocation, but upon careful analysis it will be seen that the result is not a revocation of the trust but is a performance of it: * * *. Indeed it has been held not only that the reservation of the power of revocation or modification but also that an express provision that the trustee shall hold the fund subject to the direction and control of the settlor does not invalidate a trust of personal property."

We add the two following apt quotations:

"There have been many cases of valid trusts which in practical effect were intended to be hardly more than dispositions of the property after the settlor's death. Thus cases are frequent where the owner of property has, without consideration, conveyed it to another to hold as trustee for the benefit and enjoyment of the settlor during his life, and on his death upon further trust for other beneficiaries or to pay over to designated persons. * * * The essential difference between such a trust instrument and a will is that the former acts at once to vest the interests of the beneficiaries, although their enjoyment is postponed until after the death of the settlor, but a will does not take effect until the death of the testator, and until

that time vests no interests in the beneficiaries'': I Perry on Trusts (6 ed.), p. 115, quoted in *Wilcox v. Hubbell,* 197 Mich. 21 (163 N. W. 497, 502).

"* * * Reservation of income to the settlor for life does not impair the validity of the trust. * * *

"The right of the donor to withdraw the principal of the trust does not defeat the trust: *Stone v. Hackett,* 12 Gray 227; *Davis v. Ney,* 125 Mass. 590 (28 Am. Rep. 272). Such unqualified right in reason stands on the same footing as the right to withdraw as and when required for the support of the donor, which has been upheld": *Jones v. Old Colony Trust Co.,* 251 Mass. 309 (146 N. E. 716, 717).

Our faith in the soundness of the above conclusion is greatly strengthened by a reading of the adjudications of other courts which have passed upon facts similar to those before us. We cite the following: *Ellison v. Ellison,* 6 Ves. 656; *Stone v. Hackett,* 12 Gray 227; *Nichols v. Emery,* 109 Cal. 323 (41 P. 1089, 50 Am. St. Rep. 43); *Wilcox v. Hubbell,* 197 Mich. 21 (163 N. W. 497); *National Newark & Essex Banking Co. v. Rosahl,* 97 N. J. Eq. 74 (128 Atl. 586); *Robb v. Washington & Jefferson College,* 185 N. Y. 485 (78 N. E. 359); *Hiserodt v. Hamlett,* 74 Miss. 37 (20 So. 143); *Lewis v. Curnutt,* 130 Iowa 423 (106 N. W. 914); *Kelley v. Snow,* 185 Mass. 288 (70 N. E. 89); *Jones v. Old Colony Trust Co.,* 251 Mass. 309 (146 N. E. 716); *Sims v. Brown,* 252 Mo. 58 (158 S. W. 624); *Keck v. McKinstry,* 206 Iowa 1121 (221 N. W. 851); *Roche v. Brickley,* 254 Mass. 584 (150 N. E. 866); *MacKernan v. Fox,* 220 Mass. 197 (107 N. E. 919); *Lines v. Lines,* 142 Pac. 149 (21 Atl. 809, 24 Am. St. Rep. 487); *Kelly v. Parker,* 181 Ill. 49 (54 N. E. 615); *Davis v. Ney,* 125 Mass. 590 (28 Am. Rep. 2072); *Tennant v. John Tennant Memo-*

*rial Home,* 167 Cal. 570 (140 Pac. 242) ; *Ward v. Conklin,* 232 Ill 353 (83 N. E. 1085) ; *Dolan's Est.,* 279 Pa. 582 (124 Atl. 176, 49 A. L. R. 858).

We quote from *Nichols v. Emery,* supra, the following language, which has been selected by many other courts as aptly distinguishing the characteristics of a testamentary instrument from a trust agreement:

"The essential characteristic of an instrument testamentary in nature is, that it operates only upon and by reason of the death of the maker. Up to that time it is ambulatory. By its execution the maker has parted with no rights and divested himself of no modicum of his estate, and per contra no rights have accrued to and no estate has vested in any other person. The death of the maker establishes for the first time the character of the instrument. It at once ceases to be ambulatory, it acquires a fixed status and operates as a conveyance of title. Its admission to probate is merely a judicial declaration of that status.

"Upon the other hand, to the creation of a valid express trust it is essential that some estate or interest should be conveyed to the trustee, and, when the instrument creating the trust is other than a will, that estate or interest must pass immediately: Perry on Trusts, § 92. By such a trust, therefore, something of the settler's estate has passed from him and into the trustee for the benefit of the cestui, and this transfer of interest is a present one and in nowise dependent upon the settler's death. But it is important to note the distinction between the interest transferred and the enjoyment of that interest. The enjoyment of the cestui may be made to commence in the future and to depend for its commencement upon the termination of an existing life or lives or of an intermediate estate: Civ. Code, § 707.

"Did the grantor in the present case divest himself by the instrument of any part of the estate in the land which he had formerly owned and enjoyed? By the

terms of the instrument an estate was assuredly conveyed to the trustee. The language is appropriate to a conveyance, and the grantor's execution and delivery of the deed (both found), he being under no disability, and impelled by no fraud, operated to vest so much of his estate in the trustee as was necessary to carry out the purpose of the trust. * * * We have, therefore, an estate conveyed to a named trustee for named beneficiaries, for a legal purpose and a legal term, such a trust as conforms in all its essentials to the statutory trust of the interest and estate intervening in time and enjoyment between the dates of the deed and the death of the settler can not affect the trust. The trustee takes the whole estate necessary for the purposes of the trust. All else remains in the grantor: Civ. Code, § 866. In this case there remained in the grantor the equivalent of a life estate during his own life, and he was thus entitled to remain in possession of the land, or lease it and retain the profits.''

There are several cases, which upon hasty examination, seem to have reached an opposite conclusion. When they are carefully read, however, and compared with other adjudications from the same jurisdiction it will be seen that most of them can be reconciled with the conclusion stated above. In this group of cases may be cited: *Attorney General v. Jones,* 3 Price 368 (146 Eng. Rep. 291); *Frederick's Appeal,* 52 Pa. 338 (91 Am. Dec. 159); *Warsco v. Oshkosh Savings & Trust Co.,* supra; *Russell v. Webster,* 213 Mass. 491 (100 N. E. 637); *McEvoy v. Boston Five Cent Savings Bank,* supra; *Rick's Appeal,* 105 Pa. 528.

The authority of *Attorney General v. Jones,* supra, has been weakened by *Thompson v. Browne,* 3 My & K. 35 (4 Eng. Rep. 13). The statements made in *Frederick's Appeal,* supra, and *Rick's Appeal,* 105 Pa. St. 528, both of which cases plaintiff relies upon are dimin-

ished in their force by the principles upon which the holdings in those cases are rested; for instance in the latter case it is said:

"Be that as it may, it is certain that *Frederick's Appeal* was intended to create an exception to the general rule that an instrument which conveys an estate in praesenti to a trustee, and is intended to take effect upon its delivery, even though the grantor is the only beneficiary during his life, can not be considered testamentary or revocable. The later decisions carefully distinguish those cases where a present beneficial interest is given to third persons."

In other words in the two Pennsylvania cases plaintiff relies upon no estate was conveyed in praesenti; the operation of the instrument of conveyance was postponed until the death of its author. The following Pennsylvania cases still further distinguish these two early cases and are in harmony with the conclusions we have reached: *Wilson v. Anderson,* 186 Pa. 531 (40 Atl. 1096, 44 A. L. R. 542); *Rynd v. Baker,* 193 Pa. 486 (44 Atl. 551); *Kraft v. Neuffer,* 202 Pa. 563 (52 Atl. 100), and *Rick's Appeal,* 105 Pa. 528. In *Warsco v. Oshkosh Savings & Trust Co.,* supra, and in *McEvoy v. Boston Five Cent Savings Bank,* supra, the property which was the subject-matter of the alleged trust consisted of a money which the alleged trustor had deposited with the bank with instructions that he be permitted to withdraw any sums he pleased and upon his death to distribute the remainder to certain individuals. In each instance the court seemed to find a finalty wanting in the transaction necessary to create a trust and held it testamentary. The decision, written by Mr. Justice HARRIS, in *Allen v. Hendrick,* supra, passed upon a set of facts wherein some certificates of deposit, issued by a bank, was the subject-matter of what the plaintiff, as the administrator of an estate,

alleged was a testamentary disposition, but which the defendant claimed as the alleged beneficiary of a trust. Since the decision favored the latter view we thus have an adjudication by this court upon a set of facts somewhat similar to these two cases but construing the facts as resulting in a trust. It further seems to us that some of the cases relied upon by the plaintiff fail to recognize the distinction between a voluntary promise to declare a trust and an executed trust. We quote thus from *Allen v. Hendrick,* supra: "A mere promise, without consideration, to declare a trust in the future avails nothing, but to be effective a voluntary trust must so operate as presently to transfer an interest in the thing."

In *Russell v. Webster,* supra, the subject of the alleged trust was some shares of stock. In *McEvoy v. Boston Five Cent Savings Bank,* supra, the court took no note of several of its earlier decisions which had settled some of the principles involved in that case, and which have been many times cited with respect: *Stone v. Hackett,* 12 Gray 227; *Davis v. Ney,* 125 Mass. 590 (28 Am. Rep. 272); *Kelley v. Snow,* 185 Mass. 288 (70 N. E. 89). See also the later cases of *Jones v. Old Colony Trust Co.,* 251 Mass. 309 (146 N. E. 716); *Roche v. Brickley,* 254 Mass. 584 (150 N. E. 866); both of which seem out of harmony with *Russell v. Webster* and *McEvoy v. Boston Five Cent Savings Bank.* In the recent case of *Keck v. McKinstry,* supra, which involved trust property consisting of real property, the decisions in *McElvoy v. Boston Five Cent Savings Bank* and *Warsco v. Oshkosh Savings & Trust Co.* were thus disposed of: "These cases have no analogy to a conveyance of the legal estate in real property to one in trust, for the use of the grantor during his lifetime, and of other named beneficiaries, and for dis-

tribution to them after his death. Here the legal estate in real property was conveyed to Albert McKinstry. It passed a present estate.''

It follows from the foregoing that in my opinion our previous decision was in error; I, therefore, can not agree with the conclusions of the majority.

McBride, J., concurs in dissent.